# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JONATHAN DAVID WILKE,

                    Plaintiff,

v.                                                                    Case No. 11-CV-1069-JPS

CHARLES COLE, WELCOME ROSE,
ROBERT HUMPHREYS,
KELLY A. SALINAS, LT. OLK,
SGT. CASSETTA, SGT. HENDRIX,
SGT. RUSSELL,
SOCIAL WORKER SEEDFELDT,
SGT. MCCORY, HAYLEY PUCKER,
SGT. ALBERTS, OFFICER WIMMER,
OFFICER SPARKS, SGT. GENNS,                            ORDER
SGT. SCHRAMEYER, SGT. HAYNES,
KURT LINJER, RYON CASEY,
MARK HELLESTAD, RORY THELEN,
CHARLES FACKTOR,
GERALD KONITZER,
SOCIAL WORKER BECKER,
and SOCIAL WORKER SMITH,

                    Defendants.

---

      The plaintiff, a Wisconsin state prisoner, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. He is proceeding on claims that the defendants violated the Eighth Amendment to the United States Constitution and Wisconsin Statute 101.123(2m), by smoking tobacco cigarettes or by permitting others to smoke, and thereby exposing him to environmental tobacco smoke. The defendants have filed a motion for summary judgment, which will be addressed herein.

1.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2.      Facts

The plaintiff has been incarcerated at Kettle Moraine Correctional Institution (KMCI) since September 13, 2010. The defendants are employed at KMCI unless otherwise indicated: Charles Cole, Deputy Secretary; Welcome Rose, Corrections Complaint Examiner (CCE) at the Wisconsin

Department of Corrections (DOC) Central Office in Madison, Wisconsin; Charles Facktor, CCE; Robert Humphreys, Assistant Administrator for the Division of Adult Institutions and previously Warden at KMCI from July 4, 2010, to November 19, 2011; Kelly Salinas, Inmate Complaint Examiner (ICE); Kurt Linjer, Offender Class Specialist; Ryon Casey, Supervising Officer 2; Mark Hellestad, Teacher; Rory Thelen, Supervising Officer 2; Gerald Konitzer, Sector Chief for the Bureau of Classification and Movement; Jennifer Alberts, Correctional Sergeant; Barry Cassetta, Correctional Officer; Julie Smith, Social Worker; Misty Becker, Social Worker; Hayley Pucker, Program Support Supervisor at all times relevant; James Wimmer, Correctional Sergeant; Wilbert Sparks, Correctional Officer; David McCory, Correctional Sergeant; Nancy Seedfeldt, Social Worker; Jeanine Schrameyer, Correctional Sergeant; Sara Russell, Correctional Sergeant; Daniel Hendrix, Correctional Officer; and Nathan Haynes, Correctional Sergeant.

### 2.1 History of KMCI Staff Smoking Policy

On September 23, 2005, DOC Deputy Secretary Rick Raemisch advised DOC employees of an initiative to ban all tobacco products from correctional facilities effective September 1, 2006. On October 11, 2005, KMCI staff were notified that the institution was to become tobacco-free on May 1, 2006. On October 21, 2005, the Chief Steward and President of Local 163 of the Wisconsin State Employees Union (WSEU) filed a grievance related to the directive that KMCI would become smoke-free on May 1, 2006. KMCI denied the grievance and the matter was submitted to an arbitrator for resolution. On August 22, 2006, the DOC Secretary's Office notified Warden Jenkins that KMCI was exempt from the smoke-free directive to institute tobacco cessation effective September 1, 2006, due to the pending WSEU

grievance procedure. This exemption was intended to be only until the WSEU grievance procedure was completed.

Warden Jenkins received a Memorandum dated October 12, 2006, from the Bureau of Personnel and Human Resources, and a copy of the Arbitrator's Decision dated September 28, 2006. The October 12, 2006 Arbitrator's Decision stated in part as follows: "…it is concluded the Employer violated the collective bargaining agreement when it banned tobacco product from Kettle Moraine Correctional Institution. The present practice regarding smoking during rest breaks, as reflected in Item 12 of the 1982 Local Agreement, shall remain in effect absent mutual agreement to modify it. However, the Employer retains the authority to make reasonable rules regarding designated smoking areas." (Salinas Aff. ¶¶ 31-31, Ex. 1011 at 13.)

On December 21, 2006, Warden Jenkins advised KMCI staff that, based on the arbitration award, staff smoking during rest breaks remained in effect. Warden Jenkins implemented Procedure No. 006-9 effective March 5, 2007, to comply with the applicable Wisconsin Statutes and the Arbitrator's Decision. The March 5, 2007 policy designated outside smoking areas for Units 1-12 and Towers 1, 5, and 6, and directed that smoking would no longer be allowed inside any building within the perimeter of the institution.

On February 7, 2007, Warden Jenkins postponed the implementation of Procedure No. 006-9. However, on March 23, 2007, he sent a Memorandum to all KMCI staff and provided staff with a revised Procedure Number 006-9 effective April 16, 2007, which provided that smoking by staff was allowed in designated areas only, all of which were outside. There were no staff designated smoking areas inside the building.

On March 4, 2012, KMCI Warden Brian Foster sent a Memorandum to all staff, which stated in part, "Effective June 4, 2012 use and possession of tobacco products will be prohibited by all employees, inmates, offenders, contractors, volunteers, and visitors in all areas of the Kettle Moraine Correctional Institution." (Salinas Aff. ¶ 38, Ex. 1015.) The defendants have not smoked at KMCI since June 4, 2012.

### 2.2    Inmate Complaint Review System

The plaintiff filed four offender complaints under the Inmate Complaint Review System (ICRS) related to staff smoking and exposure to second-hand smoke. Those offender complaints, which were submitted during the plaintiff's incarceration at KMCI, were assigned the following file numbers: KMCI-2011-9095; KMCI-2011-18127; KMCI-2012-959; and KMCI-2012-3057.

As ICE, defendant Salinas collects grievances filed by inmates and decides the method best suited to determine the facts, including personal interviews, telephone calls, and document reviews. An inmate who is dissatisfied with a reviewing authority's decision at the institution level may appeal that decision with the CCE, who makes a recommendation to the Secretary's Office. Defendant Humphreys was the reviewing authority who was authorized to review and decide an inmate complaint filed under the ICRS during the time he was Warden at KMCI. Humphreys dismissed or affirmed grievances, and he also returned grievances to the ICE for further investigation. Defendants Rose and Facktor, as CCEs, decided the method best suited to determine the facts, including personal interviews, telephone calls, and document review. The CCEs have access to inmates, staff, the institutions, and department records. Defendant Cole, the DOC Secretary's designee for the purpose of making final agency decisions on offender

complaints, accepts, rejects, or adopts the CCE's recommendations. Cole bases his decisions on the facts as evidenced by the documents presented to him that are relevant to the grievance, such as the offender complaint, the ICE Report, the information provided in the Offender Complaint Appeal form, the CCE Report, and any extraneous documentation available to him.

On May 9, 2011, the plaintiff filed KMCI-2011-9095. Defendant Salinas reviewed the grievance, conducted a document review, and recommended that KMCI-2011-9095 be dismissed. Defendant Humphreys received the recommendation on May 20, 2011, and, upon a review of all documentation and the ICE Report, he dismissed this grievance. On May 25, 2011, the CCE Office received an Offender Complaint Appeal form related to KMCI-2011-9095 signed by the plaintiff. Defendant Rose accepted the appeal and determined that a document review was the best method to determine the facts related to KMCI-2011-9095. On September 6, 2011, defendant Rose recommended to dismiss KMCI-2011-9095, and generated a CCE Report, which was printed and sent to the plaintiff. On September 9, 2011, defendant Cole received defendant Rose's recommendation and, upon a review of all documentation, he accepted the recommendation to dismiss this grievance.

On September 13, 2011, the plaintiff filed KMCI-2011-18127. Defendant Salinas reviewed it, conducted a document review, and recommended that KMCI-2011-18127 be dismissed. On September 25, 2011, defendant Humphreys reviewed the documentation and ICE Report, and dismissed this grievance. On October 5, 2011, the CCE Office received a form DOC-405, "Request for Corrections Complaint Examiner Review," related to KMCI-2011-18127. Defendant Facktor was assigned to review KMCI-2011-18127, and he determined that a document review was the best method to determine the facts. On February 29, 2012, defendant Facktor recommended

that the grievance be dismissed and on March 1, 2012, defendant Cole dismissed this grievance.

On January 11, 2012, the plaintiff filed KMCI-2012-959. Defendant Salinas conducted a document review, spoke with Deputy Warden Foster and Lieutenant Hofmann, and recommended that it be dismissed. On January 24, 2012, Deputy Warden Foster dismissed KMCI-2011-959.

On February 8, 2012, the plaintiff filed KMCI-2012-3057. Defendant Salinas conducted a document review and spoke with Lieutenant Falke, and then recommended that KMCI-2012-3057 be dismissed. On February 16, 2012, Deputy Warden Foster dismissed KMCI-2012-3057.

2.3     Program Review Committee

In his capacity as an Offender Class Specialist, defendant Linjer is responsible for conducting hearings regarding the custody, placement, and programming of DOC inmates. He determines the custody level and institution placement by assessing, evaluating, and determining each inmate's risk relative to his behaviors. Each DOC correctional institution is required to have a Program Review Committee (PRC) to periodically monitor inmates' custody classification, risk rating, institution placement, and program or treatment assignments for each inmate. Defendant Linjer serves on and chairs KMCI's PRC.

The PRC is responsible for reviewing and making recommendations regarding inmates' custody classifications, but the committee's recommendations do not become final without the approval of the DOC Director of the Bureau of Offender Classification and Movement or the Director's designee. An inmate's custody classification is determined by assessing the risk that the inmate presents pursuant to Wisconsin Administrative Code DOC Chapter 302.04, which risk can change over time.

To determine an inmate's custody classification, the PRC considers factors that include, but are not limited to, factors listed in Wisconsin Administrative Code Chapter 302.07. Based on the PRC's assessment, the inmate is then classified under one of the five custody classification levels described in Wisconsin Administrative Code Chapter 302.05. All inmates are entitled to scheduled program review of their custody level/classification on a yearly basis, and it is the responsibility for the institution's PRC to schedule reviews.

The PRC scheduled a review of the plaintiff's custody re-classification for August 24, 2011. The PRC included defendants Linjer, Casey, Hellestad, and Thelen. Defendant Seedfeldt prepared an Inmate Classification Report for the PRC's review and consideration. The Report noted that the plaintiff's crimes for which he was convicted included breaking into a victim's car and taking credit cards, jewelry, cigarettes, a purse and over $3,000 in cash. It was also assaultive in that physical force was used in beating and robbing the victim.

On August 11, 2011, defendant Seedfeldt met with the plaintiff relating to a scheduled PRC meeting, and she became aware of his dissatisfaction of not being placed in a different cell due to his complaints about second hand smoke exposure. Defendant Seedfeldt recommended the plaintiff remain in medium custody at KMCI due to his overall high risk assessment due to a federal detainer, program need, and sentence structure. On August 24, 2011, the plaintiff attended the PRC hearing and he requested transfer to a smoke-free institution.

The purpose of the August 24, 2011 scheduled re-classification review was to review the plaintiff's custody classification level. He was classified as a medium custody inmate and residing at KMCI, a medium custody institution. Therefore, the PRC hearing held on August 24, 2011, was to

consider whether he was appropriate for minimum custody level, custody retention, facility placement, and program needs.

The PRC recommended that the plaintiff was appropriate for medium custody retention at KMCI based on current offense, unmet program needs, offense dynamics, sentence structure, federal detainer, negative institution adjustment, and risk to the public. His offense was assaultive in nature and the PRC felt it was prudent to retain him at a medium custody institution. It was not appropriate at this time to recommend minimum custody. The PRC considered the plaintiff's negative institution adjustment because four months prior to the hearing he received a major conduct report, which negatively affected his high risk rating. The PRC also considered that the plaintiff continued to be a risk to the public due to the assaultive nature of his crime and his recent major conduct report for disruptive conduct. The federal detainer was also disconcerting because he would have more time to serve in federal prison upon release from the Wisconsin prison system. On August 25, 2011, an Inmate Classification Report was printed and given to the plaintiff.

On October 14, 2011, defendant Konitzer received DOC form 1292, "Administrative Review of Initial Classification or Re-Classification Decision," signed by the plaintiff on September 2, 2011. Konitzer rejected the plaintiff's appeal and stated as follows: "The matter of your claim of exposure to second hand smoke is not within the purview of BOCM. You may address via the inmate complaint review process." (Knuteson Aff. ¶ 4, Ex. 1018; Linjer Aff. ¶ 27.)

2.4    KMCI Cell Assignments

The plaintiff resided in Cell 110 on Unit 15 from October 29, 2010, through January 4, 2011. During this time period, defendants Becker and

Smith were social workers in Unit 15, although neither recall meeting with him. The designated staff smoking area for Unit 15 is located outside of the building near the sally port/loading dock, and there was a receptacle for staff to deposit cigarette butts. This area was restricted to staff and inmate workers who would occasionally be in the area to pick up laundry, take garbage out, and load items for pick up. Cell 110 is located toward the front of the housing unit, while the designated staff smoking area is located near the back of the unit, which is approximately 75 feet away from the sally port/loading dock. Cell 110 has a window, which can be opened and closed at the inmate's discretion, and if he felt he was exposed to second-hand smoke from the designated staff smoking area while in his cell, he could have closed his window. Defendants Becker and Smith smoked during the time they worked on Unit 15, but only in the designated staff smoking area located outside of the building, and only during their scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break.

The plaintiff resided on Unit 7 in Cell 34 from April 16, 2011, through February 13, 2012, and on Unit 3 from March 7, 2012, through March 22, 2012. Defendant Schrameyer worked on Unit 7 during April 2011, but then transferred to another unit, and she only had contact with the plaintiff on housing Unit 7 for about seven months. Defendant Schrameyer smoked while she worked on Unit 7, but only in the designated staff smoking area located outside of the building, and only during her scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break. The designated staff smoking area for Unit 7 was located outside the kitchen door on the front of the unit where patrol vehicles are parked, and this area is approximately 20 feet from the window of Cell 34. Also, there was a receptacle for staff to deposit cigarette butts.

The cells on Unit 7, which is a regular housing unit, are not equipped with a water supply for a toilet or sink, therefore, inmates are not confined to their cells on the unit. They have keys to their own cells and are free to come and go during open dayroom times as well as have access to a courtyard, which is located on the opposite side of the unit and away from the staff smoking area.

All inmate cells on housing units, including Unit 7, have a window that is approximately four feet off the ground and windows can be opened and closed by the inmate from inside the cell at the inmates' discretion, although during the winter months (October 1st through May 1st) all windows on the unit are supposed to be closed to conserve heat. Regardless of the unit the plaintiff resided on, if he had concerns about being exposed to second-hand smoke while in his cell by staff smoking in designated smoking areas, he could have closed his window. (Schrameyer Aff. ¶ 11.) However, according to the plaintiff, prisoners housed on Unit 7 in Cell 34 could still smell tobacco smoke come into their cell even with the cell window closed. (Seymour Decl. ¶ 1; Wilke Aff. ¶ 12.)

The only inmates who were typically in the area of the designated staff smoking area on Unit 7 were those inmates who were working in the kitchen or inmate workers doing work on or around the building. Due to safety and security concerns, inmates are not typically allowed in any designated staff smoking area throughout the institution grounds, with the exception of inmate workers. The plaintiff was a Unit 7 Kitchen Worker from June 26, 2011, through September 25, 2011. He was in the area of the designated staff smoking area during his working hours and exposed to cigarette smoke.

When the plaintiff resided on Unit 7 in Cell 34, defendant McCory worked on this unit. Defendant McCory smoked while he worked on Unit

7, but only in the designated staff smoking area located outside of the building, and only during his scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break. Defendant McCory generally smoked two to three cigarettes during his typical eight hour shift.

Defendant Seedfeldt was out on a medical leave from November 7, 2011, through January 2, 2012, and upon her return in January 2012, she was assigned to Unit 12 and she was also responsible for social worker duties in Units 3 and 7. Defendant Seedfeldt did smoke at KMCI, but only in designated staff smoking areas, all of which are located outside of the buildings, and only during scheduled breaks.

Defendant Pucker had contact with the plaintiff on Unit 15, which involved meeting with him either at the officer's desk or in her office or seeing him in the unit commons. Defendant Pucker smoked while working on Unit 15, but only in the designated staff smoking area located outside of the building, and only during her scheduled breaks, which consisted of two 15 minute breaks and a 30 minute lunch break. Due to safety and security concerns, defendant Pucker always tried to make sure no inmates were anywhere near her while she was smoking.

Defendant Cassetta was generally responsible for supervising and monitoring inmates on his assigned shift, which typically was the school building. The KMCI school building is located on the institution grounds, but is a separate building that accommodates approximately 300 inmates at a time, and inmates are continually entering and leaving the school building on an hourly basis through the day for vocational, special education, and general classes. The designated staff smoking area for staff working in the school building was located outside the building, at least 50 feet away from windows in the school building and about 20 feet away from the windows

in the library. During the winter months, all windows are sealed shut to conserve heat. There were typically no inmates allowed in the designated staff smoking area. Defendant Cassetta did smoke while he worked in the school building, but only in the designated staff smoking area located outside of the building, and only during his scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break. He did not smoke more than two cigarettes during a typical eight-hour shift, and he was a courteous smoker, and never smoked around non-smokers even while off-duty.

Defendants Wimmer and Sparks worked as relief officers from various housing units on the grounds of the institution. Wimmer recalls working on units where the plaintiff resided, and, at times, he had day-to-day contact with the plaintiff. The plaintiff may have been assigned to any of the units where defendant Sparks was assigned to work, but Sparks does not recall having contact with him. According to the defendants, Wimmer and Sparks did smoke while on duty at KMCI, but only in the designated staff smoking areas located outside of the building, and only during scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break. (Wimmer Aff. ¶ 6; Sparks Aff. ¶ 6.) The plaintiff avers that defendant Sparks smoked outside the designated staff smoking area. (Wilke Aff. ¶ 17.)

Defendant Haynes worked as a utility relief sergeant from various housing units on the grounds of the institution. He did smoke while he worked at KMCI, but only in the designated staff smoking areas located outside of the building, and only during his scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break. Inmates were typically not allowed in any designated staff smoking area throughout the institution grounds, unless inmates were on work assignment

in that area. Haynes had some contact with the plaintiff when he was housed on Unit 7. The cells in Unit 7 had windows, which would be opened and closed at the inmate's discretion. If the plaintiff felt that he was being exposed to second-hand smoke while in his cell, he could have closed the window. However, the plaintiff avers that prisoners housed on Unit 7 in Cell 34 could still smell tobacco smoke come into their cell even with the cell window closed.

The plaintiff resided on Unit 16 from September 13, 2010, through October 29, 2010. Unit 16 is a barrack-style unit and the plaintiff was assigned Bunk 17. During this time period, defendant Hendrix worked in Unit 16. The designated staff smoking area for Unit 16 was located outside near the north end of the building, and there was a receptacle for staff to deposit cigarette butts. The designated staff smoking area is not anywhere near the window located close to Bunk 17. The plaintiff's window faced a different direction than the location of the staff smoking area, as his bunk was on the west side of the building and the smoking area is on the east side of the building. If the plaintiff felt that second-hand smoke was getting into his window, he could have closed the window. Defendant Hendrix did smoke while he worked on Unit 16, but only in the designated staff smoking area located outside of the building, and only during his scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break.

Defendant Russell worked on Unit 16 during the time period the plaintiff resided on the unit from September 13, 2010, through October 29, 2010. Defendant Russell smoked while she worked on Unit 16, but only in the designated staff smoking area located outside of the building, and only during her scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break.

The plaintiff resided on Unit 6 in Cell 35 from January 4, 2011, through March 25, 2011. During this time period, defendant Alberts was working in Unit 6. The designated staff smoking area for Unit 6 was located outside of the building near the kitchen or servery doors, and there was a receptacle for staff to deposit cigarette butts. Inmates are not allowed in the area designated for staff smoking other than kitchen workers dropping off and picking up food items for the kitchen. All cells on Unit 6 have windows in the cells that are approximately three to four feet from the floor and go up to the ceiling. Although inmates can open and close the windows at their discretion, they are not allowed to have their windows open to the outside from October 1st through May 1st to conserve heat. The window in Cell 35 was approximately 10 feet away from the designated staff smoking area for Unit 6. If the plaintiff felt that he was being exposed to second-hand smoke from staff smoking in that area, he could have closed his window. However, according to the plaintiff, prisoners housed in Unit 6 in Cell 35 could still smell tobacco smoke come into their cell even with the cell window closed.

Defendant Alberts did smoke while she worked on Unit 6, but only in the designated staff smoking area located outside of the building, and only during her scheduled breaks, which consisted of two 15 minute breaks and a 30 or 45 minute lunch break. The plaintiff disputes this and avers that defendant Alberts smoked at least once per hour.

2.5    State Law Claim

On July 26, 2012, records maintained by the Wisconsin Department of Justice were searched concerning the service of notices of claim on the Attorney General and the copies of the notices of claim served upon the Attorney General and State. Based upon such examination of records, no notice of claim was located as having been served upon the Attorney General

pursuant to Wis. Stat. § 893.82, on behalf of the plaintiff against the defendants, with regard to the present action.

3.      Discussion

The defendants contend that they are entitled to summary judgment on the plaintiff's Eighth Amendment claim because they did not expose him to unreasonably high levels of environmental tobacco smoke (ETS) and because they were not deliberately indifferent to his ETS concerns. According to the defendants, all smoking staff (Becker, Smith, Schrameyer, Seedfeldt, Pucker, Cassetta, Winner, Sparks, Haynes, Hendrix, Russell, and Alberts) adhered to the institution policy, inmates were generally not allowed in staff smoking areas at KMCI, all cells where the plaintiff lived had windows, and all designated smoking areas are removed from the building. The defendants further contend that Linjer, Casey, Hellestad, Thelen, and Konitzer were not deliberately indifferent to the plaintiff's ETS concerns. They also contend that Cole, Rose, Factor, Humphreys, and Salinas should be dismissed for lack of personal involvement.  Finally, the defendants contend that the plaintiff's state law claim must be dismissed for failure to comply with Wisconsin's notice of claim statute.

As an initial matter, the plaintiff concedes that his state law claim is subject to dismissal for failure to comply with Wisconsin's notice of claim statute.  Thus, the defendants will be granted judgment as to that claim.

With respect to his constitutional claim, the plaintiff contends that there are genuine issues of material fact that preclude summary judgment for the defendants.  According to the plaintiff, his and the defendants' affidavits are squarely contradictory as to how often the defendants smoked cigarettes, whether they complied with their smoking policies, and if it was possible to transfer him to a smoke-free institution.  The plaintiff contends that all of the

defendants who smoked cigarettes were deliberately indifferent to his ETS concerns because, in today's society, it is well known that any exposure to ETS or second-hand smoke is dangerous to a person's current and future health. He asserts that there is also a warning from the United States Surgeon General printed on every pack of cigarettes advising smokers of the dangers of smoking and second-hand smoke. The plaintiff contends that because the defendants have shown deliberate indifference and there is a material factual dispute as to how much and how often the plaintiff was exposed to second-hand smoke, the defendants are not entitled to summary judgment.

The plaintiff also contends that defendants Linjer, Casey, Hellestad, Thelen, and Konitzer were deliberately indifferent to his ETS concerns. According to the plaintiff, the parties dispute whether a lateral transfer to another medium custody institution was possible and that, regardless, these defendants had personal knowledge of an offending condition and failed to rectify it by transferring him to a smoke-free institution. He further contends that defendants Cole, Rose, Facktor, Humphreys, and Salinas satisfy the personal responsibility requirement of 42 U.S.C. § 1983, based on the four ICRS offender complaints he submitted related to complaints of staff smoking and exposure to second-hand smoke.

The United States Constitution does not require prisons "to provide a completely smoke-free environment, except for prisoners who have asthma or some other serious respiratory condition that even a low level of ambient smoke would aggravate." *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir.2007). However, a prisoner may state a claim under the Eighth Amendment for exposure to ETS if the smoke is causing a present serious health problem or

is posing an unreasonable risk of serious damage to the prisoner's future health. *Henderson v. Sheahan,* 196 F.3d 839, 845 (7th Cir. 1999).

An inmate can state an Eighth Amendment claim for *present* injury if he alleges that he has "serious existing health problems" due to exposure to ETS, and that prison officials are aware of and have disregarded those health problems. *Id.* at 845-46; *Oliver v. Deen*, 77 F.3d 156, 158–61 (7th Cir. 1996) (concluding at summary judgment stage that asthmatic prisoner failed to demonstrate that he had serious medical need for non-smoking environment even though his exposure to second-hand smoke aggravated his asthmatic condition causing him to suffer chest pains, difficulty breathing, dizziness, nausea, and other signs of discomfort).

Here, the plaintiff does not claim to have suffered a present injury, rather, his claim is for *future* injury. A prison inmate "states a cause of action under the Eighth Amendment by alleging that [defendants] have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney,* 509 U.S. 25, 35 (1993). To prevail on such a claim, the plaintiff must satisfy both the objective and the subjective prongs of the test described in *Farmer v. Brennan,* 511 U.S. 825 (1994). To satisfy the objective test, the plaintiff "must show that he himself is being exposed to unreasonably high levels of ETS." *Helling,* 509 U.S. at 35-36. The objective prong "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a

Case 2:11-cv-01069-JPS   Filed 03/08/13   Page 18 of 21   Document 78

risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.*

To satisfy the subjective prong of the test, the evidence must show that the defendants acted with deliberate indifference to the fact that the plaintiff was exposed to levels of ETS which "pose an unreasonable risk of serious damage to his future health." *Helling,* 509 U.S. at 35. Further, liability under 42 U.S.C. § 1983 is personal; there is no liability unless the defendant "caused or participated" in the deprivation of a constitutional right. *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996). Thus, the two-prong *Farmer* test must be satisfied separately as to each defendant.

In this case, it is undisputed that the plaintiff is not currently being exposed to ETS at KMCI. Therefore, his claim for injunctive relief is moot. *See Henderson,* 196 F.3d at 849 n.3.

Additionally, the plaintiff has not shown that he was exposed to "unreasonably high levels of ETS" likely to cause future health problems. *Helling,* 509 U.S. at 35-36. He alleges that two defendants, Sparks and Alberts, smoked outside of the designated smoking area at KMCI. According to the plaintiff, Sparks smoked in a non-designated area once and Alberts did so multiple times. The plaintiff also avers that while he was on Unit 6 (January 4, 2011 – March 25, 2011) and Unit 7 (April 16, 2011 – February 13, 2012), he could smell smoke in his cell even when his window was closed. Finally, the plaintiff asserts that when he was a Unit 7 kitchen worker (June 26, 2011 – September 25, 2011), he worked near the designated staff smoking area and was exposed to ETS.

In *Henderson,* an inmate alleged that "his continuous exposure to excessive levels of second-hand smoke caused him to experience difficulty in breathing, chest pains, dizziness, drowsiness, sinus problems, burning

sensations in his throat and headaches," and that "he may experience significant health problems in the future as a result of being forced to breathe cancer-causing second-hand smoke throughout his four-and-half year detention." 196 F.3d at 842. The Seventh Circuit held that summary judgment was proper on a claim for future injury due to ETS exposure where the inmate failed to produce "competent and reliable expert medical testimony that there [is] a reasonable medical certainty that he himself faces some defined level of increased risk of developing a serious medical condition and that this increased risk was proximately caused by his exposure to second-hand smoke[.]" *Id.* at 852.[1]

As indicated above, a smoke free environment is not constitutionally required. Here, the facts demonstrate that all smoking defendants followed KMCI policy by smoking in designated smoking areas, except for two defendants. One of the defendants smoked in a non-designated area once and the other defendant did so multiple times, although it is not clear how many times the plaintiff was directly affected by the smoking. In any event, the plaintiff has not shown that he faces any level of increased risk of developing a serious medical condition and that such risk was proximately caused by his ETS exposure at KMCI. Thus, a reasonable fact finder could not conclude that the smoking defendants violated the plaintiff's rights under the Eighth Amendment. The plaintiff's claim against defendants Linjer, Casey, Hellestad, Thelen, and Konitzer for failing to transfer him to a smoke-free institution also fails because the claim hinges on the existence of an Eighth Amendment violation. Finally, the plaintiff's claim against

---

[1] The court of appeals also concluded that the inmate's claim for present injuries had been properly dismissed because he failed to allege ailments that were sufficiently serious to constitute a constitutional violation. *Id.* at 846.

Case 2:11-cv-01069-JPS   Filed 03/08/13   Page 20 of 21   Document 78

defendants Cole, Rose, Facktor, Humphreys, and Salinas for their role in investigating and deciding his ICRS complaints also fails. *See George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007). Therefore,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #41) be and the same is hereby GRANTED and this action be and the same is hereby DISMISSED on its merits.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of March, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge